**BURSOR & FISHER, P.A.**
Ines Diaz Villafana (State Bar No. 354099)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
Email: idiaz@bursor.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATTHEW KELLY, individually and on behalf of all other persons similarly situated,<br><br>                       Plaintiff,<br><br>       v.<br><br>ROKA SPORTS, INC.,<br><br>                   Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br><u>**DEMAND FOR JURY TRIAL**</u> |

Plaintiff Matthew Kelly ("Plaintiff") files this class action complaint on behalf of himself and all others similarly situated (the "Class Members") against Roka Sports, Inc. ("Roka" or "Defendant"). Plaintiff brings this action based upon personal knowledge of the facts pertaining to himself, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

## NATURE OF THE ACTION

1. This is a class action lawsuit brought on behalf of all persons who have accessed and used roka.com (the "Website"), a website that Defendant owns and operates.

2. Defendant aids, employs, agrees with, or otherwise enables a third party – Google LLC ("Google") – to eavesdrop on communications sent and received by Plaintiff and Class Members, including communications that contain sensitive, personally identifiable information relating to eyewear purchases. By failing to procure consent before enabling Google's interception of these communications, Defendant violated the Federal Wiretap Act, 18 U.S.C. § 2510, *et seq.*, and the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code §§ 631-632.

## THE PARTIES

3. Plaintiff Matthew Kelly is an adult citizen residing in Oakland, California. On or around November 16, 2025, Plaintiff Kelly visited the Website on the same browser that he used to access Google's products and services[1] (including Gmail). Plaintiff Kelly was in California when he visited the Website. Upon accessing the Website, Plaintiff Kelly browsed for and purchased a pair of prescription eyeglasses. Unbeknownst to Plaintiff, these communications were intercepted in transit by Google – as enabled by Defendant – including communications that contained Plaintiff's sensitive, personally identifiable information relating to eyewear purchases. Neither Defendant nor Google procured Plaintiff's prior consent to this interception.

4. Defendant Roka Sports, Inc. is a Delaware corporation with its principal place of business at 2214 W Braker Lane, Suite A, Austin, Texas 78758. Defendant is an eyewear company that designs, manufactures, and sells prescription and non-prescription eyeglasses, as well as

---

[1] *See* GOOGLE, PRODUCTS, https://about.google/intl/ALL_us/products/.

performance-oriented sunglasses through the Website, roka.com.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action where there are more than 100 members and the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs, and at least one member of the putative Class is a citizen of a state different from Defendant.

6.      The Court has personal jurisdiction over Defendant because Defendant has purposefully availed itself of the laws and benefits of doing business in California, and Plaintiff's claims arise out of Defendant's forum-related activities.  Plaintiff accessed and navigated the Website while in California, and Defendant assisted Google with intercepting Plaintiff's communications in this District.

7.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial portion of the events giving rise to this action occurred in this District.

## FACTUAL ALLEGATIONS

### I.      The California Invasion of Privacy Act

8.       The California Legislature enacted the Invasion of Privacy Act to protect certain privacy rights of California citizens.  The legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society."  Cal. Penal Code § 630.

9.      The California Supreme Court has repeatedly stated an "express objective" of CIPA is to "protect a person placing or receiving a call from a situation where the person on the other end of the line *permits an outsider to tap his telephone or listen in on the call*."  *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985) (emphasis added).

10.      Further, as the California Supreme Court has held in explaining the legislative purpose behind CIPA:

> While one who imparts private information risks the betrayal of his
> confidence by the other party, a substantial distinction has been recognized

> between the secondhand repetition of the contents of a conversation and its *simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.*
>
> As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication—the right to control the nature and extent of the firsthand dissemination of his statements.

*Ribas v. Clark*, 38 Cal. 3d 355, 360-61 (1985) (emphasis added; internal citations omitted).

11. As part of CIPA, the California Legislature enacted § 631(a), which prohibits any person or entity from [i] "intentionally tap[ping], or mak[ing] any unauthorized connection … with any telegraph or telephone wire," [ii] "willfully and without the consent of all parties to the communication … read[ing], or attempt[ing] to read, or to learn the contents or meaning of any … communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within [California]," or [iii] "us[ing], or attempt[ing] to use … any information so obtained."

12. CIPA § 631(a) also penalizes [iv] those who "aid[], agree[] with, employ[], or conspire[] with any person" who conducts the aforementioned wiretapping, or those who "permit" the wiretapping.

13. As part of the Invasion of Privacy Act, the California Legislature additionally introduced Penal Code § 632(a), which prohibits any person or entity from "intentionally and without the consent of all parties to a confidential communication, us[ing] an electronic amplifying or recording device to eavesdrop upon or record [a] confidential communication."

14. A "confidential communication" for the purposes of CIPA § 632 is "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto."  Cal. Penal Code § 632(c).

15. Individuals may bring an action against the violator of CIPA §§ 631 and 632 for $5,000 per violation.  Cal. Penal Code § 637.2(a)(1).  Plaintiff does so, here, against Defendant.

**II.   The Federal Wiretap Act**

16. The Federal Wiretap Act, as amended by the Electronic Communications Privacy Act of 1986, makes it unlawful for a person to intentionally intercept, endeavor to intercept or procure

any other person to intercept or endeavor to intercept any wire, oral or electronic communication. 18 U.S.C. § 2511(a).

17.     Under the Federal Wiretap Act, "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of [the Federal Wiretap Act] may in a civil action recover from the person or entity . . . which engaged in that violation such relief as may be appropriate." 18 U.S.C. § 2520(a).

18.     Persons who have been damaged due to the unauthorized interception, disclosure, and use of their confidential communications are entitled to: (1) damages, in an amount to be determined at trial, assessed as the greater of (a) the sum of the actual damages suffered by Plaintiff and any profits made by Defendant as a result of the violation, or (b) statutory damages of whichever is the greater of $100 per day per violation or $10,000; (2) appropriate equitable or declaratory relief; and (3) reasonable attorneys' fees and other costs reasonably incurred.

## III.     Overview of Defendant's Website

19.     Defendant is a retailer that sells prescription and non-prescription glasses, as well as sunglasses directly to consumers through its Website.

20.     Unbeknownst to Plaintiff and Class Members, however, Defendant aids, agrees with, employs, and otherwise enables Google to eavesdrop on their confidential Website communications using Google's wiretaps, as set out *infra*.

21.     Website users' confidential communications are the product of users affirmatively entering, and interacting with, information on the Website (*i.e.*, the confidential communications are not procedurally or automatically generated). Instead, as set out below, the confidential communications stem from users actively making selections. All of the foregoing is information created through the intent of Website users, *e.g.*: (1) information created by and in response to users' communicative inputs; (2) information created by and in response to users' intended messages to the Website, and Defendant; and (3) information created by the Website in response to users' having conveyed and expressed their respective desires that the Website would supply them with certain, highly personalized, types of information and/or responses. Google's wiretaps, as installed and

integrated by Defendant, contemporaneously intercepts Website users' button clicks communicating such information.

22.    Upon visiting roka.com, Website users encounter a banner prompting them to select a product category to browse (*e.g.*, "eyeglasses," "sunglasses," etc.).  *See* Screen 1.



**"Screen 1"**

//

//

//

//

//

23.    Next, Website users can browse and select an eyewear frame within a particular product category (*e.g.*, "Rory 2.0" prescription glasses, "Hunter 2.0" prescription sunglasses, etc.). Frames can be chosen based on several criteria, such as frame shape, face shape, size, lens technology, prescription type, frame color, lens color, and/or frame material.  *See* Screen 2.



**"Screen 2"**

24.    After selecting a desired frame, Website users can customize their glasses by choosing a frame color and proceeding to the lens configuration options.  *See* Screen 3.



**"Screen 3"**

25. Among other lens configuration options, Website users can select their prescription type (*e.g.*, "single vision" or "progressive"). *See* Screen 4.



**"Screen 4"**

26. Website users can then further customize their glasses' lenses, including by selecting from various lens purposes (*e.g.*, "standard all-purpose," "ultimate," or "computer"); lens materials (*e.g.*, "polycarbonate," "Trivex," or "high index"); and lens colors (*e.g.*, "clear," "blue light protection," or "photochromic"). *See* Screens 5-7.



**"Screen 5"**

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED
CASE NO.

8



**"Screen 6"**



**"Screen 7"**

27. Website users are subsequently prompted to upload their prescription, send their prescription later, or take a vision test. *See* Screen 8.



**"Screen 8"**

28. Next, Website users are offered the chance to add a nose pad to their eyewear. *See* Screen 9.



**"Screen 9"**

29. Website users are then asked to review their selections, presented with a subtotal, and prompted to add their eyewear to their cart. *See* Screen 10.



**"Screen 10"**

30. Website users can also add other eyewear to their order. For example, Website users may select from one or more "readers." *See* Screen 11.



**"Screen 11"**

31.     Once Website users select a particular pair of "readers," they can customize their glasses by choosing a frame color and selecting a lens magnification. *See* Screen 12. Website users may add any additional pair(s) of eyewear to their cart. *See id.*



**"Screen 12"**

//

//

//

//

//

//

//

//

//

//

//

32.     Website users check out by entering their contact information (first and last name, email, phone number), shipping address, and billing details. *See* Screen 13.

**"Screen 13"**

## IV.   Google's Tracking Technology

33.   Google wiretaps the Website with its tracking technologies, which Defendant purposefully installed on the Website.

34.   Google's tracking technologies send secret instructions to a Website user's browser, without alerting the individual that this is happening.  The trackers then cause the browser to secretly and simultaneously duplicate the user's Website communications, transmitting these communications to Google's servers alongside additional information about the Website user's identity.  This entire process occurs within milliseconds.  In other words, when a user communicates with Defendant's Website, those communications are simultaneously and contemporaneously duplicated and sent to Google at the same time as they are being sent to Defendant.  Thus, Google's interception of these communications occurs "in transit."  *See, e.g.*, *In re Facebook Internet Tracking Litig.*, 956 F.3d 589, 608 (9th Cir. 2020) ("Permitting an entity to engage in the unauthorized duplication and forwarding of unknowing users' information would render permissible the most common methods of intrusion…"); *Revitch v. New Moosejaw, LLC*, 2019 WL 5485330, at *2 (N.D. Cal. Oct. 23, 2019) ("Even if the browser caused a parallel signal to be sent to NaviStone, that intervention happened while the signal was already in transit from Revitch's device. Section 631's protections extend explicitly to the beginnings and ends of communications…"); *James v. Walt Disney Co.*, 701 F. Supp. 3d 942, 961-62 (N.D. Cal. 2023) (finding in-transit interception was alleged based on similar process to the one alleged herein).

35.   Specifically, Google wiretaps the Website with trackers associated with "Google Analytics."[2]  According to Google, "Google Analytics is a platform that collects data from [] websites and apps to create reports that provide insights into [] business[es]."[3]  "To measure a website … [one] add[s] a small piece of JavaScript measurement code to each page on [a] site."[4]  Then, "[e]very time a user visits a webpage, the tracking code will collect … information about how that

---

[2] GOOGLE, START LEARNING ABOUT GOOGLE ANALYTICS, https://developers.google.com/analytics.

[3] GOOGLE, HOW GOOGLE ANALYTICS WORKS, https://support.google.com/analytics/answer/12159447.

[4] *Id.*

user interacted with the page."[5]  Specifically, Google Analytics tracks "events"; "sessions"; and "users[.]"[6]

36.    "Events let [clients] measure … when someone loads a page, clicks a link, [] makes a purchase[]" and more.[7]  Google provides a menu of "recommended events" (*i.e.*, "completes a purchase"; "searches [] website or app"; "select content on [] website or app"; "views an item"; "views their shopping cart")[8] and also allows for "collect[ing] additional information that Google Analytics does not collect automatically[,]" through "custom events."[9]

37.    A "session" is "the period from when a user visits [a] website or app to when they leave [said] website or app[.]"[10]  "When a session starts, Google automatically collects a session_start event and generates a session ID (ga_session_id) and session number (ga_session_number)[.]"[11]

38.    Finally, to discern when "two different [users] interact with [a] website[,] … Google Analytics identifies an individual user based on [Google Analytics] reporting identit[ies.]"[12] Reporting identities are combinations of "identifiers … called *identity spaces*" – namely, "User-ID"; "user-provided data"; "device ID"; and "modeling[.]"[13]

- A "User-ID" is a "persistent ID[,]"[14] consisting of a unique combination of up to "256 characters[,]"that is created by website operators and "assign[ed] and consistently reassign[ed] … to [] users[,] … typically [] during login."[15]

- "User-provided data" consists of contact details such as "email, phone,

---

[5] *Id.*

[6] GOOGLE, TRAFFIC-SOURCE DIMENSIONS, https://support.google.com/analytics/answer/11080067.

[7] GOOGLE, SET UP EVENTS, https://developers.google.com/analytics/devguides/collection/ga4/events.

[8] GOOGLE, [GA4] RECOMMENDED EVENTS, https://support.google.com/analytics/answer/9267735.

[9] GOOGLE, [GA4] CUSTOM EVENTS, https://support.google.com/analytics/answer/12229021.

[10] GOOGLE, TRAFFIC-SOURCE DIMENSIONS, https://support.google.com/analytics/answer/11080067.

[11] GOOGLE, [GA4] ABOUT ANALYTICS SESSIONS, https://support.google.com/analytics/answer/9191807.

[12] GOOGLE, TRAFFIC-SOURCE DIMENSIONS, https://support.google.com/analytics/answer/11080067.

[13] GOOGLE, [GA4] REPORTING IDENTITIES, https://support.google.com/analytics/answer/10976610.

[14] *Id.*

[15] GOOGLE, [GA4] MEASURE ACTIVITY ACROSS PLATFORMS WITH USER-ID, https://support.google.com/analytics/answer/9213390.

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    15
CASE NO.

name and address[,]" provided by website users, that "is [] matched with other Google data … to improve the accuracy of [] measurement data and power enhanced Analytics capabilities."[16]  Although these personal details are "hashed,"[17] the reality is that, even in hashed form, they are traceable to individuals.[18]

- A "device ID" is a "browser-based or mobile-app-based identifier[.]"[19] "On a website, device ID gets its value from the client ID property of the _ga cookie. In an iOS or Firebase app, device ID gets its value from the app-instance ID, which identifies a unique installation of the app."[20]

- "Modeling" uses "machine learning to model the behavior of users who decline analytics cookies based on the behavior of similar users who accept analytics cookies."[21]

39.    Google Analytics can also leverage "Google signals," which "associates [data] with user[s'] … Google accounts," for "users who have signed in … and who have turned on Ads Personalization."[22] "This association of data with these signed-in users is used to enable cross-device remarketing, and cross-device key events export to Google Ads."[23]

---

[16] GOOGLE, [GA4] USER-PROVIDED DATA COLLECTION, https://support.google.com/analytics/answer/14077171.

[17] *Id.*

[18] *See, e.g.*, FEDERAL TRADE COMMISSION, DOES HASHING MAKE DATA "ANONYMOUS"?, https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2012/04/does-hashing-make-data-anonymous ("[H]ashing is vastly overrated as an 'anonymization' technique … the casual assumption that hashing is sufficient to anonymize data is risky at best, and usually wrong."); FEDERAL TRADE COMMISSION, NO, HASHING STILL DOESN'T MAKE YOUR DATA ANONYMOUS, https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/07/no-hashing-still-doesnt-make-your-data-anonymous ("[H]ashes aren't 'anonymous' and can still be used to identify users, and their misuse can lead to harm. Companies should not act or claim as if hashing personal information renders it anonymized."); Steven Englehardt et al., I NEVER SIGNED UP FOR THIS! PRIVACY IMPLICATIONS OF EMAIL TRACKING, at 122, available at https://petsymposium.org/2018/files/papers/issue1/paper42-2018-1-source.pdf ("[H]ashing of PII, including emails, is not a meaningful privacy protection. This is folk knowledge in the security community, but bears repeating."); MARTECH, FTC PRIVACYCON: YOUR EMAIL ADDRESS IS LEAKING AND VULNERABLE, https://martech.org/ftc-privacycon-email-address-leaking-vulnerable ("Hashing is an algorithmic process that turns [information] into a gibberish label[.] … Although gibberish, it's unique, so it can be employed as an anonymized identifier. It's supposed to be one-way, meaning that you can't turn the gibberish back into the [original form]. Wrong, says Englehardt and his colleagues.").

[19] GOOGLE, [GA4] DEVICE ID, https://support.google.com/analytics/answer/9356035.

[20] *Id.*

[21] GOOGLE, [GA4] BEHAVIORAL MODELING FOR CONSENT MODE, https://support.google.com/analytics/answer/11161109.

[22] GOOGLE, [GA4] ACTIVATE GOOGLE SIGNALS FOR GOOGLE ANALYTICS PROPERTIES, https://support.google.com/analytics/answer/9445345.

[23] *Id.*

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                16
CASE NO.

40.     When Google uses its wiretaps on Website users' communications, the wiretaps are not like tape recorders or "tools" used by one party to record the other.  Instead, Google—a separate and distinct entity from the parties to the conversations—uses the wiretaps to eavesdrop upon, record, extract data from, and analyze conversations to which it is not a party.  Google itself, collects the contents of said conversations.  That data is then analyzed by Google before being provided to any entity that was a party to the conversations (like Defendant).

41.     Google has the capability to use the contents of conversations it collects through its wiretaps for its own purposes.

## V.     Defendant Aids, Agrees With, Employs, and Otherwise Enables Google to Wiretap Website Users' Communications

42.     Google, as enabled by Defendant, contemporaneously intercepts the following Website communications, as highlighted in the excerpts of the Website's transmissions below.

43.     As highlighted below, Google intercepts the Screens 1 URL visited by Website users, which identifies that Website users have navigated to the Website's homepage. *See infra* ("https://www.roka.com/").  As highlighted below, Google intercepts the Screen 2 URL visited by Website users, which identifies the product category selected by Website users on Screen 1. *See infra* ("https://www.roka.com/collections/progressive-eyewear-for-men").

| dl | https://www.roka.com/ |
|----|----|
| dt | Home \| ROKA |
| en | page_view |
| _ee | 1 |
| tfd | 2095 |

| dl | https://www.roka.com/collections/progressive-eyewear-for-men |
|----|----|
| dr | https://www.roka.com/ |
| dt | Progressive Eyewear for Men \| ROKA |
| en | page_view |
| _ee | 1 |
| tfd | 1551 |

//

//

//

44. As highlighted below, Google intercepts the Screen 3 URL visited by Website users, which identifies the eyewear frame and corresponding product category selected by Website users on Screen 2. *See infra* ("https://www.roka.com/products/hunter-prescription-eyeglasses-for-men?variantId=44498219696175").

| dl | https://www.roka.com/products/hunter-prescription-eyeglasses-for-men?variantId=44498219696175 |
|----|------|
| dr | https://www.roka.com/collections/progressive-eyewear-for-men |
| dt | Hunter Prescription Glasses \| Tall Modern Square Glasses \| ROKA |
| en | page_view |
| _ee | 1 |
| tfd | 1109 |

45. As highlighted below, Google intercepts the frame color selected by Website users on Screen 3. *See infra* ("Crystal Slate"). As highlighted below, Google intercepts the prescription type and lens purpose selected by Website users on Screens 4-5. *See infra* ("Progressive Ultimate"). As shown below, Google intercepts the lens material selected by Website users on Screen 6. *See infra* ("High Index"). As shown below, Google intercepts the lens color selected by Website users on Screen 7. *See infra* ("Photochromic"). As highlighted below, Google intercepts when Website users select the option to add a nose pad to their eyewear on Screen 9. *See infra* ("Nose Pad Kit Add On"). The foregoing is intercepted when a Website user clicks "Add to Cart" on Screen 10, confirming their selections. *See infra* ("add_to_cart").

| cu | USD |
|----|------|
| sid | 1768500983 |
| sct | 2 |
| seg | 1 |
| dl | https://www.roka.com/products/hunter-prescription-eyeglasses-for-men?variantId=44498219728943 |
| dr | https://www.roka.com/products/hunter-prescription-eyeglasses-for-men?variantId=44498219696175 |
| dt | Hunter Prescription Glasses \| Tall Modern Square Glasses \| ROKA |
| en | add_to_cart |
| _c | 1 |
| _ee | 1 |
| pr1 | idE7544-0652-FRAME~nmHunter 2.0 Eyeglasses~lp0~brROKA~va Crystal Slate / Regular (52)~pr270.0~qt1 |
| ep.value | 270.0 |
| _et | 29422 |
| tfd | 46618 |

```
cu          USD
sid         1768500983
sct         2
seg         1
dl          https://www.roka.com/products/hunter-prescription-eyeglasses-for-men?variantId=44498219728943
dr          https://www.roka.com/products/hunter-prescription-eyeglasses-for-men?variantId=44498219696175
dt          Hunter Prescription Glasses | Tall Modern Square Glasses | ROKA
en          add_to_cart
_c          1
_ee         1
pr1         idRX-TYPE-PROG-ULT~nmPrescription Type-lp0~brROKA~vaProgressive Ultimate~pr335.0~qt1
ep.value    335.0
_et         19
tfd         46751
```

```
cu          USD
sid         1768500983
sct         2
seg         1
dl          https://www.roka.com/products/hunter-prescription-eyeglasses-for-men?variantId=44498219728943
dr          https://www.roka.com/products/hunter-prescription-eyeglasses-for-men?variantId=44498219696175
dt          Hunter Prescription Glasses | Tall Modern Square Glasses | ROKA
en          add_to_cart
_c          1
_ee         1
pr1         idRX-MATERIAL-HIGH_INDEX~nmPrescription Lens Material-lp0~brROKA~vaHigh Index~pr95.0~qt1
ep.value    95.0
_et         19
```

```
cu          USD
sid         1768500983
sct         2
seg         1
dl          https://www.roka.com/products/hunter-prescription-eyeglasses-for-men?variantId=44498219728943
dr          https://www.roka.com/products/hunter-prescription-eyeglasses-for-men?variantId=44498219696175
dt          Hunter Prescription Glasses | Tall Modern Square Glasses | ROKA
en          add_to_cart
_c          1
_ee         1
pr1         idRX-TINT-PHOTO~nmPrescription Lens Color-lp0~brROKA~vaPhotochromic~pr110.0~qt1
ep.value    110.0
_et         23
```

```
cu          USD
sid         1768500983
sct         2
seg         1
dl          https://www.roka.com/products/hunter-prescription-eyeglasses-for-men?variantId=44498219728943
dr          https://www.roka.com/products/hunter-prescription-eyeglasses-for-men?variantId=44498219696175
dt          Hunter Prescription Glasses | Tall Modern Square Glasses | ROKA
en          add_to_cart
_c          1
_ee         1
pr1         idE8927-0100~nmGEKO™ Nose Pad Kit Add On-lp0~brROKA~va4Base Black~pr5.0~qt1
ep.value    5.0
_et         27
tfd         46658
```

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                    19
CASE NO.

46.   As highlighted below, Google intercepts the Screen 12 URL visited by Website users, which identifies the particular "readers" (including frame color) selected by Website users on Screens 11 and 12. *See infra* ("https://www.roka.com/products/rory-huberman-blue-light-readers-glasses?variantId=43661811286063").

| pscdl | noapi |
|---|---|
| ec_mode | a |
| _eu | AEAAAGQ |
| _s | 3 |
| tag_exp | 103116026~103200004~104527906~104528500~104684208~104684211~105391252~115938465~115938468~116682877~117041587 |
| dl | https://www.roka.com/products/rory-huberman-blue-light-readers-glasses?variantId=43661811286063 |
| dr | https://www.roka.com/products/rory-huberman-blue-light-readers-glasses?variantId=43661811122223 |
| sid | 1768500983 |
| sct | 2 |
| seg | 1 |
| dt | Rory 2.0 Wind Down™ Reading Glasses \| Slim Rectangular Readers \| ROKA |
| en | page_view |
| _et | 4198 |
| tfd | 10107 |

47.   As highlighted below, Google intercepts the "readers" lens magnification selected by Website users on Screen 12. *See infra* ("Clear Frame - Wind Down Lens / 3"). The foregoing is intercepted when a Website user clicks "Add to Cart" on Screen 12, confirming their selection. *See infra* ("add_to_cart").

| pscdl | noapi |
|---|---|
| ec_mode | a |
| _prs | ok |
| _eu | AAAAAGQ |
| _s | 4 |
| tag_exp | 103116026~103200004~104527906~104528500~104684208~104684211~105391252~115938465~115938468~116682877~117041587 |
| cu | USD |
| sid | 1768500983 |
| sct | 2 |
| seg | 1 |
| dl | https://www.roka.com/products/rory-huberman-blue-light-readers-glasses?variantId=43661811286063 |
| dr | https://www.roka.com/products/rory-huberman-blue-light-readers-glasses?variantId=43661811122223 |
| dt | Rory 2.0 Wind Down™ Reading Glasses \| Slim Rectangular Readers \| ROKA |
| en | add_to_cart |
| _c | 1 |
| _ee | 1 |
| pr1 | idE7906-1152-3030~nmRory 2.0 Wind Down™ Readers~lp0~brROKA~vaClear Frame - Wind Down™ Lens / 3~pr165.0~qt1 |
| ep.value | 165.0 |
| _et | 7261 |
| tfd | 17384 |

46.    As highlighted below, Google intercepts when Website users begin checkout on Screen 13, along with the items previously added to their cart. *See infra* ("begin_checkout").

47.    As highlighted below, Google intercepts when Website users add their shipping and payment information on Screen 13, along with the items previously added to their cart. *See infra* ("add_shipping_info" and "add_payment_info").

## VI.   Defendant Enables Google to Pair the Above Data with Users' Identities

48.   As discussed *supra*, § IV, the Google tracking technologies at issue can pair wiretapped data with website users' identities.

49.   To do so, the Google Analytics identity spaces and Google signals rely, at least in part, on Google cookies.[24]  A cookie is a "small text file (up to 4KB) created by a website that is stored in the user's computer either temporarily for that session only or permanently in storage (persistent cookie)."[25]  Persistent cookies can be used to "track user behavior across different sites. They store information such as geographic location, device specifications, and specific actions taken on the website."[26]  Thus, together, the Google cookies allow Google Analytics to "'remember' what a user has done on previous pages [and their] interactions with the [W]ebsite."[27]

//

//

---

[24] *See, e.g.*, GOOGLE, OUR ADVERTISING AND MEASUREMENT COOKIES, https://business.safety.google/adscookies/; GOOGLE, GOOGLE ANALYTICS COOKIE USAGE ON WEBSITES, https://web.archive.org/web/20240303080533/https://developers.google.com/analytics/devguides/collection/analyticsjs/cookie-usage; OPEN COOKIE DATABASE, https://jkwakman.github.io/Open-Cookie-Database/open-cookie-database.html.

[25] PC MAGAZINE, COOKIE TABLE, https://www.pcmag.com/encyclopedia/term/cookie.

[26] COOKIEBOT, WHAT ARE TRACKING COOKIES AND HOW DO THEY WORK?, https://www.cookiebot.com/en/tracking-cookies/.

[27] GOOGLE, GOOGLE ANALYTICS COOKIE USAGE ON WEBSITES, https://web.archive.org/web/20240303080533/https://developers.google.com/analytics/devguides/collection/analyticsjs/cookie-usage.

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                    22
CASE NO.

50.    The following image confirms that, when a user accesses the Purchase and Screening Website while logged into a Google account, the Google tracking technologies on the Website compel that user's browser to transmit several Google cookies, including the AEC; APISID; DV; _ga; HSID; NID; SAPISID; _Secure-1PAPISID; _Secure-1PSID; _Secure-1PSIDCC; _Secure-1PSIDTS; _Secure-3PAPISID; _Secure-3PSID; _Secure-3PSIDCC; _Secure-3PSIDTS; SID; SIDCC; and SSID cookies:

| Name | Value | Domain ▲ |
|---|---|---|
| __Secure-1PAPISID | 8IscJSRJu2tu4JEI/ATO9wRVMbozILz4IB | .google.com |
| __Secure-1PSID | g.a0007QhRa3bMDjxKqfa4rrqxaK6tp4u2bFa5_JITYH... | .google.com |
| __Secure-1PSIDCC | AKEyXzVNpYraAZykwVChm8hdpMwq7E3QJVZ5piR... | .google.com |
| __Secure-1PSIDRTS | sidts-CjcBBj1CYptY4VgLHGEeZtpYGF4E7DBpz3nksPi... | .google.com |
| __Secure-1PSIDTS | sidts-CjcBBj1CYptY4VgLHGEeZtpYGF4E7DBpz3nksPi... | .google.com |
| __Secure-3PAPISID | 8IscJSRJu2tu4JEI/ATO9wRVMbozILz4IB | .google.com |
| __Secure-3PSID | g.a0007QhRa3bMDjxKqfa4rrqxaK6tp4u2bFa5_JITYH... | .google.com |
| __Secure-3PSIDCC | AKEyXzVKpeWqLFGEnh-iiTmWbVxNpvt3wAa5XTWZ... | .google.com |
| __Secure-3PSIDRTS | sidts-CjcBBj1CYptY4VgLHGEeZtpYGF4E7DBpz3nksPi... | .google.com |
| __Secure-3PSIDTS | sidts-CjcBBj1CYptY4VgLHGEeZtpYGF4E7DBpz3nksPi... | .google.com |
| __Secure-BUCKET | CPMD | .google.com |
| __Secure-STRP | AD6DogsQvlQ97LP4c98zaA81NnVA4R9DAoY6gtDh... | .google.com |
| APISID | hv251uoKJ6g9wsTm/Aq3ba9AGz_N3-qXA6 | .google.com |
| HSID | Az3KmJbcb7pi9ymmd | .google.com |
| NID | 529=c-9ZbBXFaNvrSpyckBGyMx7Ip-dUhs6O681YLc... | .google.com |
| SAPISID | 8IscJSRJu2tu4JEI/ATO9wRVMbozILz4IB | .google.com |
| SEARCH_SAMESITE | CgQJpKAB | .google.com |
| SID | g.a0007QhRa3bMDjxKqfa4rrqxaK6tp4u2bFa5_JITYH... | .google.com |
| SIDCC | AKEyXzUoafzs3EFEMgPH4hq4tov81gq43C_Ld9pxjX... | .google.com |
| SSID | AV1F0IXPUn2AtU4zN | .google.com |
| _ga | GA1.1.807347611.1772604668 | .roka.com |
| _ga_S03PQ2FDRF | GS2.1.s1772604668$o1$g1$t1772604689$j39$l0$h... | .roka.com |
| _gcl_au | 1.1.826507902.1772604669 | .roka.com |

51.    The AEC cookie "ensure[s] that requests within a browsing session are made by the user, and not by other sites[,]" and has a lifespan on 6 months.[28]

52.    The APISID; HSID; SAPISID; SID; SIDCC; and SSID cookies are marketing cookies that, *inter alia*, "[a]djust[] the ads that appear in Google Search" and all have a lifespan of 2 years.[29]

53.    The DV marketing cookie "is used to collect website statistics and track conversion rates and Google ad personalization" and has a lifespan of one year.[30]

---

[28] OPEN COOKIE DATABASE, https://jkwakman.github.io/Open-Cookie-Database/open-cookie-database.html.

[29] *Id.*

[30] *Id.*

54.    The _ga cookie is an "ID used to identify users" and has a lifespan of 2 years.[31]

55.    The NID marketing cookie "is used to collect website statistics and track conversion rates and Google ad personalization[,]" and has a lifespan of 1 year.[32]

56.    The _Secure-1PAPISID; _Secure-1PSID; _Secure-1PSIDCC; and _Secure-1PSIDTS cookies are "[t]argeting cookie[s u]sed to create a user profile and display relevant and personalised Google Ads to the user."[33]   The _Secure-1PAPISID; _Secure-1PSID; _Secure-1PSIDCC; and _Secure-1PSIDTS cookies have a lifespan of 2 years.[34]

57.    The _Secure-3PAPISID is a marketing cookie that "[p]rofiles the interests of website visitors to serve relevant and personalised ads through retargeting" and has a lifespan of 2 years.[35]

58.    The _Secure-3PSID cookie is a "[t]argeting cookie[ u]sed to profile the interests of website visitors and display relevant and personalised Google ads" and has a lifespan of 2 years.[36]

59.    The _Secure-3PSIDCC and _Secure-3PSIDTS cookies are "[t]argeting cookie[s u]sed to create a user profile and display relevant and personalised Google Ads to the user."[37]

60.    The _Secure-3PSIDCC and _Secure-3PSIDTS cookies have a lifespan of 2 years.[38]

61.    Even when a user accesses the Purchase and Screening Website while not logged into a Google account, the Google tracking technologies on the Website compel that user's browser to transmit several Google cookies, including the _ga and NID cookies:

| Name | Value | Domain |
|---|---|---|
| NID | 529=b52DqwgvxNBVTiuXi4C7U2cp7y1x6KD_bPSal... | .google.com |
| _ga | GA1.1.534792181.1772605175 | .roka.com |
| _ga_S03PQ2FDRF | GS2.1.s1772605175$o1$g1$t1772605207$j28$l0$h... | .roka.com |
| _gcl_au | 1.1.1173504943.1772605175 | .roka.com |

---

[31] *Id.*

[32] *Id.*

[33] *Id.*

[34] *Id.*

[35] *Id.*

[36] *Id.*

[37] *Id.*
[38] *Id.*

62.     Defendant also uses Google signals, which "associates [data] with user[s'] … Google accounts," for "users who have signed in …  and who have turned on Ads Personalization."[39]  The highlighted lines below show that Defendant enabled Google signals.

## **CLASS ALLEGATIONS**

63.     Plaintiff seeks certification of the following class: all persons in the United States who, during the class period, accessed and navigated the Website (the "Class" or "Nationwide Class").

64.     Plaintiff also seeks to represent a subclass consisting of all California residents who, during the class period, accessed and navigated the Website while in California (the "California Subclass") (the Class and Subclass collectively, the "Classes").

65.     Plaintiff reserves the right to modify the Class definition, including by using subclasses, as appropriate based on further investigation and discovery obtained in the case.

66.     The "Class Period" is the time period beginning on the date established by the Court's determination of any applicable statute of limitations, after considering of any tolling, concealment, and accrual issues, and ending on the date of entry of judgement.

67.     The following people are excluded from the Classes: (1) any Judge presiding over this action and members of his or her family; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest

---

[39] GOOGLE, [GA4] ACTIVATE GOOGLE SIGNALS FOR GOOGLE ANALYTICS PROPERTIES, https://support.google.com/analytics/answer/9445345.

(including current and former employees, officers, or directors); (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

68. **Numerosity/Ascertainability:** Members of the Classes are so numerous that joinder of all members would be unfeasible and not practicable. The exact number of Class Members is unknown to Plaintiff at this time; however, it is estimated that there are hundreds of thousands of individuals in the Classes. The identity of such membership is readily ascertainable from Defendant's records and non-party records, such as those of Google.

69. **Typicality:** The claims of the named Plaintiff are typical of the claims of the Class because the named Plaintiff, like all other class members, purchased eyewear on the Website, and had his confidential electronic communications intercepted and/or disclosed to Google.

70. **Adequate Representation:** Plaintiff is fully prepared to take all necessary steps to represent fairly and adequately the interests of the Class Members.  Plaintiff's interests are coincident with, and not antagonistic to, those of the members of the Classes. Plaintiff is represented by attorneys with experience in the prosecution of class action litigation generally and in the emerging field of digital privacy litigation specifically. Plaintiff's attorneys are committed to vigorously prosecuting this action on behalf of the members of the Classes.

71. **Commonality and Predominance:** There are well-defined common questions of fact and law that exist as to all members of the Classes and that predominate over any questions affecting only individual members of the Classes. These common legal and factual questions, which do not vary between members of the Classes, and which may be determined without reference to the individual circumstances of any Class member, include, but are not limited to, the following: whether Defendant violated the Federal Wiretap Act, 18 U.S.C. § 2510, *et seq.*; CIPA § 631; and Plaintiff's and Class Members' privacy rights as provided by the California Constitution and common law, and whether Plaintiff and the proposed Class members are entitled to damages, reasonable attorneys' fees, prejudgment interest and costs of this suit.

72.   **Superiority:**  Class action treatment is a superior method for the fair and efficient adjudication of the controversy.  Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action. Plaintiff knows of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

<u>CAUSES OF ACTION</u>
<u>COUNT I</u>
**Violation of the Federal Wiretap Act,**
**18 U.S.C. § 2510, *et seq.***
**(On Behalf of Plaintiff, the Nationwide Class and California Subclass)**

73.   Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein and brings this count individually and on behalf of the members of the Classes.

74.   The Federal Wiretap Act, as amended by the Electronic Communications Privacy Act of 1986, makes it unlawful for a person to intentionally intercept, endeavor to intercept or procure any other person to intercept or endeavor to intercept any wire, oral or electronic communication. 18 U.S.C. § 2511(a).

75.   Further, the Federal Wiretap Act makes it unlawful for a person to intentionally disclose, or endeavor to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral or electronic communication in violation of the Federal Wiretap Act. 18 U.S.C. § 2511(1)(c).

76.   Further, the Federal Wiretap Act makes it unlawful for a person to intentionally use, or endeavor to use, the contents of any wire, oral, or electronic communication, knowing or having

reason to know that the information was obtained through the interception of a wire, oral or electronic communication in violation of the Federal Wiretap Act. 18 U.S.C. § 2511(1)(d).

77. The Federal Wiretap Act protects both the sending and receiving of communications.

78. Among other ways, a violation of the Federal Wiretap Act occurs if a person:

> (a) intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication; [or]

> (b) intentionally uses, endeavors to use, or procures any other person to use or endeavor to use any electronic, mechanical, or other device to intercept any oral communication[.]

18 U.S.C. § 2511.

79. Under the Federal Wiretap Act, "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of [the Federal Wiretap Act] may in a civil action recover from the person or entity . . . which engaged in that violation such relief as may be appropriate." 18 U.S.C. § 2520(a).

80. In violation of the Federal Wiretap Act, 18 U.S.C. § 2511(1)(a), Defendant intentionally procured third-party Google, to intercept and endeavor to intercept the electronic communications of Plaintiff and Class Members, namely the transmissions of the confidential and sensitive communications of Plaintiff and Class Members via the Website. At relevant times, Defendant knew that by integrating and embedding Google's tracking technology, Google would intercept the electronic communications of users of the Website.

81. In violation of the Federal Wiretap Act, 18 U.S.C. § 2511(1)(a), Defendant intentionally intercepted, and endeavored to intercept, the electronic communications of Plaintiff and Class Members, namely the transmissions of the confidential and sensitive communications of Plaintiff and Class Members via the Website.

82. In violation of the Federal Wiretap Act, 18 U.S.C. § 2511(1)(c), Defendant disclosed, and endeavored to disclose, the contents of the electronic communications of Plaintiff and Class Members to generate profits and increase revenues by, *inter alia*, attempting to increase its number

of customers through targeted marketing based on an analysis of the intercepted communications, knowing and having reason to know that the information was obtained through the unlawful interception of the electronic communications of Plaintiff and Class Members, in violation of the Federal Wiretap Act, as alleged herein. Indeed, Defendant procured Google to surreptitiously intercept the communications of Plaintiff and Class Members without their consent, thereby knowing that the information from those communications was obtained in violation of the Federal Wiretap Act.

83.     In violation of the Federal Wiretap Act, 18 U.S.C. § 2511(1)(d), Defendant used, and endeavored to use, the contents of the electronic communications of Plaintiff and Class Members to generate profits and increase revenues by, *inter alia*, attempting to increase its number of customers through targeted marketing based on an analysis of the intercepted communications, knowing and having reason to know that the information was obtained through the unlawful interception of the electronic communications of Plaintiff and Class Members, in violation of the Federal Wiretap Act, as alleged herein.    Indeed, Defendant procured Google to surreptitiously intercept the communications of Plaintiff and Class Members without their consent, thereby knowing that the information from those communications was obtained in violation of the Federal Wiretap Act.

84.     The following items constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

   a.   The codes and programs Google used to track Plaintiff's and Class Members' communications while they were navigating the Website;

   b.   Plaintiff's and Class Members' browsers;

   c.   Plaintiff's and Class Members' computing devices;

   d.   The codes and programs used by Google to effectuate its tracking and interception of Plaintiff's and Class Members' communications while they were using a browser to visit Defendant's Website; and

   e.   The plan Google carried out to effectuate its tracking and interception of the Plaintiff's and Class Members' communications while they were using Defendant's Website.

85.     The Website communications that Defendant permitted Google to intercept, and that Defendant otherwise disclosed to Google, via Defendant's integration of the Google tracking

technology on the Website – *i.e.*, sensitive, personally identifiable information relating to eyewear purchases – constitutes the contents of electronic communication because it includes detailed URL requests and button clicks that contain information Plaintiff and the Classes actively inputted into the Website.

86. The transmissions described above were "transfer[s] of signs, signals, writing, … data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetics, photoelectronic, or photooptical system that affects interstate commerce[,]" and were therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

87. Google was not an authorized party to the communications between Plaintiff and Class Members, on the one hand, and Defendant, on the other, because Plaintiff and Class Members did not know that this third party was surreptitiously intercepting the data at issue and did not knowingly send any communications to Google.

88. Plaintiff and Class Members did not consent to Defendant's conduct of: (1) procuring Google to intercept and endeavor to intercept their confidential communications; (2) intercepting their confidential communications; (3) disclosing their confidential communications under circumstances that violated the Federal Wiretap Act; and (4) using their confidential communications under circumstances that violated the Federal Wiretap Act.

89. Defendant intentionally intercepted and endeavored to intercept Plaintiff's and Class Members' communications for the purpose of committing a tortious or criminal act in violation of the Constitution or laws of the United States or of any State – namely, invasion of privacy and violation of the CIPA, among others.

90. Defendant was not acting under color of law in intercepting and endeavoring to intercept Plaintiff's and Class Members' communications.

91. Defendant and Google intercepted and endeavored to intercept the communications of Plaintiff and Class Members made via the Website while those communications were in transit, as opposed to being in storage. Indeed, Defendant and Google intercepted and endeavored to intercept the communications of Plaintiff and Class Members in real time and contemporaneously

with Plaintiff and Class Members engaging in those communications.

92.    After intercepting the communications, Google used the contents of the communications to provide Defendant with analytics and marketing services, as well as for its own business purposes.

93.    As a result of the above actions, Plaintiff and Class Members have been damaged due to the unauthorized interception, disclosure, and use of their confidential communications in violation of 18 U.S.C. § 2520.  As such, Plaintiff and Class Members are entitled to: (1) damages, in an amount to be determined at trial, assessed as the greater of (a) the sum of the actual damages suffered by Plaintiff and any profits made by Defendant as a result of the violation, or (b) statutory damages of whichever is the greater of $100 per day per violation or $10,000; (2) appropriate equitable or declaratory relief; and (3) reasonable attorneys' fees and other costs reasonably incurred.

**COUNT II**
**Violation of the California Invasion of Privacy Act,**
**Cal. Penal Code § 631**
**(On Behalf of Plaintiff and the California Subclass)**

94.    Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

95.    Plaintiff brings this Count individually and on behalf of the members of the Subclass.

96.    CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978).  Thus, to establish liability under CIPA § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> *Or*
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while

the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,

*Or*

Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,

*Or*

Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

97.    CIPA § 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

98.    Google's tracking technology is a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

99.    Google is a "separate legal entity that offers [a] 'software-as-a-service' and not merely a passive device." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021). Further, Google has the capability to use the wiretapped information for its own purposes. Accordingly, Google has been a third party to any communications between Plaintiff and Subclass Members, on the one hand, and Defendant, on the other. *Id.* at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

100.    At all relevant times, through its tracking technology, Google willfully and without the consent of all parties to the communication, and/or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiff and Subclass Members, on the one hand, and Defendant, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

101. At all relevant times, Google used or attempted to use the communications intercepted by its tracking technologies for its own purposes.

102. At all relevant times, Defendant aided, agreed with, employed, permitted, and otherwise enabled Google to wiretap Plaintiff and Subclass Members using Google's tracking technology and to accomplish the wrongful conduct at issue here.

103. Plaintiff and Subclass Members did not provide their prior consent to Google's intentional access, interception, reading, learning, recording, collection, and usage of Plaintiff's and Subclass Members' electronic communications. Nor did Plaintiff and Subclass Members provide their prior consent to Defendant aiding, agreeing with, employing, permitting, and otherwise enabling Google's conduct.

104. The wiretapping of Plaintiff and Subclass Members occurred in California, where Plaintiff and Subclass Members accessed the Website, and where Google—as enabled by Defendant—routed Plaintiff's and Subclass Members' electronic communications to Google's servers.

105. Pursuant to Cal. Penal Code § 637.2, Plaintiff and Subclass Members have been injured by Defendant's violations of CIPA § 631(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 631(a).

## COUNT III
### Violation of the California Invasion of Privacy Act,
### Cal. Penal Code § 632
### (On Behalf of Plaintiff and the California Subclass)

106. Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

107. Plaintiff brings this Count individually and on behalf of the members of the California Subclass.

108. CIPA § 632(a) prohibits an entity from:

> intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one

another or by means of a telegraph, telephone, or other device, except a radio.

109. Section 632 defines "confidential communication" as "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto[.]"

110. The data collected on Defendant's Website constitutes "confidential communications," as that term is used in Section 632, because Class Members had an objectively reasonable expectation of private with respect to their personally identifiable information relating to eyewear purchases.

111. Plaintiff and Class Members expected their communications to Defendant to be confined to Defendant. Plaintiff and Class Members did not expect any third party, and specifically Google, to secretly eavesdrop upon or record this information and their communications.

112. Google's tracking technologies are electronic amplifying or recording devices for purposes of § 632.

113. By contemporaneously intercepting and recording Plaintiff's and Class members' confidential communications to Defendant through Google's tracking technology, Google eavesdropped and/or recorded confidential communications through an electronic amplifying or recording device in violation of § 632 of CIPA.

114. At no time did Plaintiff or Class members consent to Defendant or Google's conduct, nor could they reasonably expect that their communications to Defendant would be overheard or recorded by Google.

115. At all relevant times, Google used or attempted to use the communications intercepted by its tracking technologies for its own purposes.

116. Defendant is liable for aiding and abetting violations of Section 632 by Google.

117. Pursuant to Cal. Penal Code § 637.2, Plaintiff and Members of the California Subclass have been injured by the violations of Cal. Penal Code § 632, and each seek damages for the greater of $5,000 or three times the amount of actual damages, as well as injunctive relief.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                                     34
CASE NO.

**COUNT IV**
**Invasion of Privacy Under California's Constitution**
**(On Behalf of Plaintiff and the California Subclass)**

118. Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

119. Plaintiff brings this Count individually and on behalf of the members of the Subclass.

120. Plaintiff and Subclass Members have an interest in: (1) precluding the dissemination and/or misuse of their sensitive, confidential communications about their eyewear purchases; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to wiretaps without Plaintiff's and Subclass Members' knowledge or consent.

121. At all relevant times, by installing and embedding Google tracking technology into the Website so that Google could intercept and/or otherwise obtain users' private communications with Defendant regarding their eyewear purchases, Defendant intentionally invaded Plaintiff's and Subclass Members' privacy rights under the California Constitution.

122. Plaintiff and Subclass Members had a reasonable expectation that their communications about their eyewear purchases, and other private information, would remain confidential and that Defendant would not enable Google's interception of this sensitive information given that Defendant did not provide Plaintiff and Subclass Members with the required notice of its practice of disclosures.

123. Plaintiff and Subclass Members did not authorize Defendant to record and transmit Plaintiff's and Subclass Members' private eyewear purchase communications alongside their personally identifiable information.

124. This invasion of privacy is serious in nature, scope, and impact because it relates to private eyewear purchase communications. Moreover, it constituted an egregious breach of the societal norms underlying the privacy right.

125. Accordingly, Plaintiff and Subclass Members seek all relief available for invasion of

privacy claims under California's Constitution.

**COUNT V**
**Intrusion Upon Seclusion**
**(On Behalf of Plaintiff, the Nationwide Class and California Subclass)**

126. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

127. Plaintiff brings this Count individually and on behalf of the members of the Classes.

128. Plaintiff and Class Members have an interest in: (1) precluding the dissemination and/or misuse of their sensitive, confidential communications about their eyewear purchases; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to wiretaps without Plaintiff's and Class Members' knowledge or consent.

129. At all relevant times, by installing and embedding the Google tracking technology into the Website, so that Google could intercept users' private communications with Defendant regarding their eyewear purchases, Defendant intentionally invaded Plaintiff's and Class Members' privacy rights by intruding into their private place, conversation or matter. Defendant's actions amount to an intrusion upon Plaintiff's and Class Members' privacy because Plaintiff and Class Members did not consent to the particular conduct that Defendant engaged in—allowing Google to intercept their sensitive conversations related to their eyewear purchases.

130. Plaintiff and Class Members had a reasonable expectation that their communications about their eyewear purchases, and other private information, would remain confidential and that Defendant would not enable third party interception of this sensitive information given that Defendant did not provide Plaintiff and Class Members with the required notice of its practice of disclosures.

131. Plaintiff and Class Members did not authorize Defendant to record and transmit Plaintiff's and Class Members' private eyewear purchase communications alongside their personally identifiable information.

132. This invasion of privacy is highly offensive and serious in nature, scope, and impact

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                           36
CASE NO.

because it relates to private eyewear purchase communications. Moreover, it constituted an egregious breach of the societal norms underlying the privacy right.

133. Accordingly, Plaintiff and Class Members seek all relief available for Defendant's intrusion upon their seclusion.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

a. For a determination that this action is a proper class action;

b. For an order certifying the Class and Subclass, naming Plaintiff as representative of the Class and California Subclass, and naming Plaintiff's attorneys as Class Counsel to represent the Classes;

c. For an order declaring that Defendant's conduct violates the statutes referenced herein;

d. For an order finding in favor of Plaintiff and the Classes, and Subclass on all counts asserted herein;

e. For an award of compensatory damages, including statutory damages where available, to Plaintiff, Class, and Subclass Members against Defendant for all damages sustained as a result of Defendant's wrongdoing, in an amount to be proven at trial;

f. For punitive damages, as warranted, in an amount to be determined at trial;

g. For an order requiring Defendant to disgorge revenues and profits wrongfully obtained;

h. For prejudgment interest on all amounts awarded;

i. For injunctive relief as pleaded or as the Court may deem proper;

j. For an order awarding Plaintiff, the Class, and the Subclass their reasonable attorneys' fees and expenses and costs of suit; and

k. For an order granting Plaintiff, Class, and Subclass Members such further relief as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all causes of action and issues so triable.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED
CASE NO.

37

Dated: March 18, 2026

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By:     */s/ Ines Diaz Villafana*

Ines Diaz Villafana (State Bar No. 354099)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
Email: idiaz@bursor.com

*Attorneys for Plaintiff*